IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| SUSAN M. LEWIS,<br><br>Plaintiff,<br>v.<br><br>STOPANTISEMITISM, a private entity, individually doing business as STOPANTISEMITISM.ORG; and LIORA REZNICHENKO, an individual,<br><br>Defendants. | Case No.: 3:25-cv-02082-AN<br><br>OPINION AND ORDER |

Plaintiff Susan M. Lewis brings this action against defendants StopAntisemitism and Liora Reznichenko for defamation, false invasion of privacy, tortious interference with contractual relations, and intentional infliction of emotional distress. On November 18, 2025, defendants filed a special motion to strike pursuant to Oregon's statute prohibiting Strategic Lawsuits Against Public Participation (Oregon's "anti-SLAPP" statute). *See* Or. Rev. Stat. ("ORS") § 31.150. Defendants also moved in the alternative to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Moreover, on June 29, 2026, defendants filed a motion for extension of time to answer plaintiff's complaint. For the reasons described below, defendants' motion for extension of time to answer complaint is GRANTED, defendants' special motion to strike is GRANTED, and the Court does not reach defendants' alternative motion to dismiss. The complaint is dismissed with leave to amend.

## LEGAL STANDARDS

Oregon's anti-SLAPP statute, ORS § 31.150, "provides a mechanism for a defendant to move to strike certain nonmeritorious claims predicated on speech and petitioning activity potentially entitled to constitutional protection." *Tokarski v. Wildfang*, 313 Or. App 19, 21, 496 P.3d 22, *rev. den.*, 368 Or. 788, 498 P.3d 301, 810 (2021). It thus "creates an expedited procedure for dismissal of certain non-meritorious civil cases without prejudice at the pleading stage." *Neumann v. Liles*, 358 Or. 706, 723 (2016). Pursuant to this statute, a defendant may file a special motion to strike any civil claim that arises out of:

> (a)(A) Any oral statement made, or written statement or other document submitted, in a legislative, executive or judicial proceeding or other proceeding authorized by law;
>
> (B) Any oral statement made, or written statement or other document submitted, in connection with an issue under consideration or review by a legislative, executive or judicial body or other proceeding authorized by law;
>
> (C) Any oral statement made, or written statement or other document presented, in a place open to the public or a public forum in connection with an issue of public interest; or
>
> (D) Any other conduct in furtherance of the exercise of the constitutional right of assembly, petition or association or the constitutional right of free speech or freedom of the press in connection with a public issue or an issue of public interest;

ORS § 31.150(2).

Courts apply a "two-step burden-shifting process" when addressing special motions to strike under Oregon's anti-SLAPP statute. *Wingard v. Or. Family Council, Inc.*, 290 Or. App. 518, 521, 417 P.3d 545 (2018). First, the defendant bears the burden of showing that the challenged claim arises out of statements or conduct protected under ORS § 31.150(2). *Id.* at 521-22. "Second, if the defendant meets that burden, then the burden shifts to the plaintiff 'to establish that there is a probability that the plaintiff will prevail on the claim by presenting substantial evidence to support a prima facie case.'" *Id.* at 522 (quoting ORS § 31.150(3)). When an anti-SLAPP motion is brought in federal court, the standard of review depends on whether the motion challenges the legal or factual sufficiency of a claim. *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018). When legal sufficiency is challenged, "a district court should apply the Federal Rule of Civil Procedure 12(b)(6) standard and consider whether a claim is properly stated." *Id.* A plaintiff therefore can "properly respond merely by showing sufficiency of pleadings." *Id.* On the other hand, when the factual sufficiency is challenged, "the Federal Rule of Civil Procedure 56 standard will apply" and "discovery must be allowed . . . before any decision is made by the court." *Id.* A plaintiff responding to a factual challenge must therefore present substantial evidence to support their claims. *See id.*; *see also Handy v. Lane Cty.*, 360 Or. 605, 623, 385 P.3d 1016 (2016). Evidence must be viewed "in the light most favorable to plaintiff" when making this determination. *Waggoner v. Husk*, 337 Or. App. 519, 522, 564 P.3d 167, 170 (2025).

Federal courts should freely grant leave to amend if a complaint is dismissed based on a legal anti-

SLAPP challenge. *See Verizon Delaware, Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1091 (9th Cir. 2004). However, "[a] district court does not err in denying leave to amend where the amendment would be futile.". *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991).

## BACKGROUND

### A. Factual Background

Plaintiff is a professional musician who has worked as a private music teacher for over thirty years. Decl. of Susan M. Lewis ("Lewis Decl."), ECF 12, ¶ 2. During the 2023-2024 school year, plaintiff worked as an independent contractor at Valley Catholic Music School ("Valley Catholic"). Compl., ECF 1-1, ¶ 7; Lewis Decl. ¶ 2. As an independent contractor at Valley Catholic, plaintiff was not "part of the regular teaching staff." Lewis Decl. ¶ 3. Accordingly, Lewis did not teach any formal classes or work out of an assigned classroom. *Id.* Instead, plaintiff taught private violin and cello lessons to Valley Catholic students in practice rooms across the K-12 campus. *Id.* Plaintiff also taught strings classes to students and non-student community members at Valley Catholic's summer camp. *Id.* "Prior to August 2024, [plaintiff] posted some of [her] opinions regarding certain geopolitical events, including but not limited to the war in Gaza and its occupation by Israeli armed forces, on [her] personal Facebook page." Lewis Decl. ¶ 4. Plaintiff expressed these views "entirely outside of the summer music camp and the private lessons with [her] students at Valley Catholic" and did not share or discuss these opinions with her students. *Id.*

StopAntisemitism is a national organization focused on highlighting threats to Jewish safety and civil rights. Decl. of Liora Reznichenko ("Reznichenko Decl."), ECF 6, ¶ 3. One of the ways it seeks to do this is by publishing recurring features "designed to inform the public about antisemitism expressed by public figures, educators, activists, and institutions," including a recurring feature entitled "Corrupting the Classroom." *Id.* ¶¶ 4-5. Through the "Corrupting the Classroom" feature, StopAntisemitism shares publicly accessible statements made by various educators, along with defendants' commentary on the statements. *See id.* ¶ 5 & Ex. 1. On August 21, 2024, StopAntisemitism shared on its X.com profile a "Corrupting the Classroom" feature focused on plaintiff. *Id.* ¶¶ 10, 18 & Ex. 1; Lewis Decl. Ex. 1. The feature, which was spread across several X posts, includes screenshots of statements plaintiff made on her

public Facebook account, archived links to those Facebook posts, and defendants' statements about plaintiff and her posts. Reznichenko Decl. ¶¶ 8-12 & Ex. 1.

Defendants' first posts begin by stating, "Warning to parents of students in Beaverton, OR. Valley Catholic High School's Sue Lewis is not just instructing in the music school—she's using her platform to spread vile antisemitic hate online." *Id.* at Ex. 1. Following that is a bulleted list that states that plaintiff "claims Israel killed its own citizens during the October 7th massacre by Hamas terrorists[, ] calls upon Hamas to destroy Israel[, and] denounces the atrocities of Hamas against innocent Israeli victims." *Id.* The next post begins, "Sue Lewis continues her antisemitic tirades." *Id.* It is then followed by its own bulleted list, stating that plaintiff "denies the Jewish connection to Israel[; ] claims Jews control humanity, a dangerous trope[; and] labels Zionism (Jewish self-determination) a terror movement based on Jewish supremacy." *Id.* The post concludes by stating, "Students at [Valley Catholic] are in grave danger under Sue Lewis. Concerned? Email info@valleycatholic.org." Below the final statement is an archived list of plaintiff's Facebook posts. *Id.* Screenshots of AntiSemitism's posts are shown below:



Reznichenko Decl. at Ex. 1.

Four of plaintiff's archived posts are particularly relevant to this motion. *See* Reznichenko Decl. at Exs. 1-5. The first is a photograph, which plaintiff posted on February 16, 2024, that appears to show plaintiff wearing a black-and-white keffiyeh. *Id.* Ex. 6. The remaining four posts contain only text. The first post, which was shared by plaintiff on November 2, 2023, states, "Yeah these Hamas militants are going to wipe out Israel with their homemade bombs, small arms, hang gliders, grenades and slingshots. Be afraid, be very afraid." *Id.* at Ex. 2. The second post, which plaintiff shared on October 22, 2018, states, "If Jewish people want their own state they shouldn't not put it on some else's state. Genocide is no way to make a state!" *Id.* at Ex. 3. The third post, which plaintiff shared on April 4, 2024, appears to show a dictionary-style definition of "Zionism" as "[a]n inherently violent & terroristic movement for colonizing Palestine through the theft of Palestinian land and the ethnic cleansing of indigenous Palestinians in order to create a Jewish-supremacist settler colony." *Id.* ¶ 15 & Ex. 4. The fourth and final post, which plaintiff shared on October 21, 2018, states, "Zionist Jews have managed to mentally condition humanity to accept and remain silent as they commit genocide in Palestine." *Id.* at Ex. 5.

Many Facebook users posted comments in response to defendants' feature. *See* Lewis Decl. Ex. 1. Some comments appear to support plaintiff, some appear to support defendants, and some appear to be written by plaintiff herself because of the name "Sue Lewis". *See id.* at Ex. 1 at 6-8 (all citations refer to ECF pagination). Following defendants' feature, plaintiff "received a torrent of hateful comments and direct messages, some of which were violent and threatening, from strangers who had read" the posts. *Id.* ¶ 6.

On August 21, 2024—the same day that StopAntisemitism shared its feature on plaintiff—Valley Catholic informed plaintiff that it would not be renewing her contract for the 2024-2025 school year. *Id.* ¶ 7.

On August 25, 2024, StopAntisemitism shared another post that named plaintiff along with several other educators as "Corrupting the Classroom.". *Id.* Ex. 2. Also on August 25, plaintiff received a comment on her "professional Facebook Page" from Rose Hoffner, stating, "Thanks to our advocacy, Sue Lewis has

been terminated by her employer, Valley Catholic High School." *Id.* ¶ 11 & Ex. 3.[1] On September 18, 2024, StopAntisemitism shared another post stating, "UPDATE: antisemite Sue Lewis is thankfully no longer teaching at Valley Catholic High School." *Id.* ¶ 12 & Ex. 4. On September 30, 2024, StopAntisemitism posted pictures of plaintiff and two other educators with the word "FIRED" below their names. *Id.* ¶ 13 & Ex. 5. On October 7, 2024, plaintiff received a direct message via Facebook Messenger from Gillian Murphy stating that StopAntisemitism's work has led to "[a]pproximately 200 consequences for antisemites in our communities, leading to arrests, firings, expulsions, and canceled events . . . including approximately fifty medical professionals and two dozen educators!" *Id.* ¶ 14 & Ex. 6.

**B. Procedural Background**

Plaintiff initiated this action in the Multnomah County Circuit Court on August 20, 2025, ECF 1-1. Defendants removed the action to this Court on November 7, 2025, on the basis of diversity jurisdiction, ECF 1. On November 18, 2025, defendants filed a special motion to strike pursuant to Oregon's anti-SLAPP statute or, in the alternative, to dismiss under Federal Rule of Civil Procedure 12(b)(6) ("Defs. Mot. to Strike"), ECF 5. Plaintiff responded in opposition on December 16, 2025, ECF 11, and defendants filed a reply on December 30, 2025, ECF 13.

On June 29, 2026, defendants filed a motion for extension of time to answer complaint ("Defs. Mot. to Extend"), ECF 22, to which plaintiffs objected at the July 1, 2026 hearing, *see* ECF 25. On July 7, 2026, defendants filed corrected versions of their motion to dismiss and reply brief. *See* ECF 27, ECF 28.

## DISCUSSION

Pending before the Court are defendants' motion to extend time and defendants' motion to strike. Plaintiff argues that defendants' motion to extend should be denied and that defendants' motion to strike should thus be denied as untimely. Plaintiff also argues that defendants' motion should be denied on the merits. The Court considers each of these issues in turn.

---

[1] Plaintiff's declaration states that this comment was received on August 25, 2025. The Court assumes that this is a typographic error and that the comment was received on August 25, 2024.

**A. Timeliness**

As a threshold matter, plaintiff challenges the timeliness of defendants' motion and asks the Court to deny it on that basis. *See* Pl. Resp. 20. Defendants do not dispute that the motion was filed after the seven-day deadline set by Federal Rule of Civil Procedure 81(c), but argue that the Court should retroactively extend defendants' filing deadline. *See* Defs. Mot to Extend. Defendants also argue, based on the anti-SLAPP statute's grant of discretion and state appellate court precedent, that the Court should reach the merits of their motion despite the untimely filing. *See* Defs. Mot. to Strike.

1. *Deadline*

This preliminary question begins with a preliminary question of its own: what deadline applies? Anti-SLAPP motions brought in federal court fall into a procedural grey area. *See Miller v. Watson*, No. 3:18-cv-00562-SB, 2019 WL 1871011, at *4 (D. Or. Feb. 12, 2019) (collecting cases), *report and recommendation adopted*, 2019 WL 1867922 (D. Or. Apr. 25, 2019); *see also Gopher Media LLC v. Melone*, 154 F.4th 696, 713 (9th Cir. 2025), *cert. denied*, No. 25-1067, 2026 WL 1717993 (U.S. June 15, 2026). "Although anti-SLAPP motions appear to be a procedural mechanism to vindicate existing substantive rights, they are generally allowed in federal court." *Id.* (citations omitted). Federal courts follow many—but not all—of the rules prescribed by state anti-SLAPP statutes. *See id.* If a statutory rule directly collides with a Federal Rule of Civil Procedure, federal courts must instead follow the Federal Rule. *See Metabolife International Inc. v. Wornick*, 264 F.3d 832, 845-46 (9th Cir. 2001). If the rules do not collide, the anti-SLAPP statute's procedures "may properly be invoked in federal court" so long as they advance "the twin purposes of the *Erie* doctrine." *Id.* at 845 (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

The pertinent timing rules seem to collide here. Oregon's anti-SLAPP statute provides that "[a] special motion to strike . . . must be filed within 60 days after the service of the complaint or, in the court's discretion, at any later time." ORS § 31.152(1). Federal Rule of Civil Procedure 81(c), on the other hand, provides that "[a] defendant who did not answer before removal must answer or present other defenses or objections under these rules within . . . 7 days after the notice of removal is filed." Fed. R. Civ. P.

81(c)(2)(C).[2] Rule 6(b) additionally provides that a federal court may modify deadlines for good cause, if the modification is made before the deadline has expired, or "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1). Oregon's anti-SLAPP statute thus seems to conflict with the federal rules as to both the deadline itself, as set by Rule 81(c), and the extent of discretion a court may exercise in extending that deadline, as established by Rule 6(b).

The Ninth Circuit has not weighed in on whether Oregon's statutory deadline collides with Rules 81(c) and 6(b). In fact, the Ninth Circuit has not addressed the *Erie* question as to the timing of *legal* anti-SLAPP challenges at all.[3] It has, however, found in a short line of cases that California's similar anti-SLAPP provision collides with Rule 56 on *factual* anti-SLAPP challenges.

This line of cases begins with *Metabolife*, in which the Ninth Circuit assessed California's anti-SLAPP timing provision alongside a neighboring provision that "provides that the filing of an anti-SLAPP motion automatically stays all further discovery until the court rules on the motion."[4] 264 F.3d at 846. The *Metabolife* court held that the "discovery-limiting aspects" of these subsections "collide with the discovery-allowing aspects of Rule 56" and therefore "cannot apply in federal court." *Id.* The court did not address the deadline-setting aspect of the statute, nor did it discuss the implication of its ruling on legal anti-SLAPP challenges.

Second, in *Sarver v. Chartier*, the Ninth Circuit held that the deadline-setting aspect of California's anti-SLAPP provision directly collided with Rule 56 in the context of a factual anti-SLAPP challenge. 813 F.3d 891 (9th Cir. 2016). The *Sarver* court thus "decline[d] to apply the statute's 60-day time frame in

---

[2] Rule 81(c) instructs the court to use the longest of three potential deadlines: twenty-one days after receiving the initial pleading, twenty-one days after service of summons, or seven days after notice of removal. Fed. R. Civ. P. 81(c)(2). Defendants were served on October 10, 2025. *See* Notice of Removal Ex. 15. The response deadline under the twenty-one-day periods would therefore be October 31, 2025, well before defendants filed the notice of removal on November 7, 2025.

[3] At the hearing, both parties agreed that defendants' motion to strike may be viewed as a legal challenge.

[4] Oregon's neighboring subsection similarly provides that "[a]ll discovery in the proceeding shall be stayed upon the filing of a special motion to strike" and that the stay "shall remain in effect until entry of judgment" although the court "may order that specified discovery be conducted notwithstanding the stay imposed by this subsection." ORS § 31.152(2).

federal court." *Id.* at 900.

Finally, Judge Bress reiterated the *Sarver* holding in his concurring opinion in *Gopher Media*. Judge Bress explained that California's "timing rule directly collides with the more permissive timing rule under Rule 56," and, "[a]s a result, for anti-SLAPP motions that sound in Rule 56," the Ninth Circuit allows "the filing of the motion at any time until 30 days after the close of all discovery. Litigants in federal court can thus bring anti-SLAPP motions much later in litigation, following discovery that the anti-SLAPP statute would generally not permit in the first place." 154 F.4th at 712 (J. Bress, concurring) (cleaned up).

It is therefore clear that federal courts must apply the federal rules when addressing the deadline for a factual anti-SLAPP motion. It is less clear, however, whether those same rules apply to legal anti-SLAPP challenges, or whether this line of Ninth Circuit precedent applies to legal challenges at all. At least two courts have reasoned that *Sarver* should not apply under such circumstances. In *Clifford v. Trump*, for example, the Central District of California did not directly reach the issue, but nonetheless reasoned:

> The 60-day deadline is a procedural rule under the *Erie* doctrine that conflicts with Federal Rule of Civil Procedure 56. This is because the 60-day deadline seeks to limit discovery and allow for anti-SLAPP motions at an early stage of litigation, while Rule 56 seeks to promote discovery, requiring motions for summary judgment after litigation has proceeded for some time. . . . however, [the present] motion is analogous to a motion to dismiss, not a motion for summary judgment. The discovery rationale that underpins a case like *Metabolife International* does not exist here.

339 F. Supp. 3d 915, 923 (C.D. Cal. 2018), *aff'd*, 818 F. App'x 746 (9th Cir. 2020) (citation omitted). In *Novel v. Los Angeles County Sherrif's Department*, another Central District of California court found that "the rationale set forth in *Sarver*" did not apply because the motion at issue "was 'analogous to a motion to dismiss, not a motion for summary judgment.'" *Novel v. Los Angeles Cnty. Sheriff's Dep't. et al.*, No. 2:19-cv-01922-RGK-AGR, 2020 WL 3884437, at *2 (C.D. Cal. Mar. 30, 2020) (quoting *Clifford*, 339 F. Supp. 3d at 923).

While the discovery-centered rationale underlying *Metabolife*, *Sarver*, and *Gopher Media* does not exist here, Oregon's anti-SLAPP deadline-setting provision nonetheless directly collides with the Federal Rules of Civil Procedure. Under Oregon's anti-SLAPP statute, it is within the court's discretion to accept a late-filed special motion to strike at any time during litigation. *See* ORS § 31.152(1). The Federal Rules,

by contrast, are more limiting. When the original deadline has not yet expired, a court may extend such deadline "for good cause," either on motion or on its own initiative. Fed. R. Civ. P. 6(b)(1)(A). After the deadline has passed, however, the court may extend time only for good cause "on motion . . . if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). This Court is therefore persuaded, in light of this apparent conflict, that the federal rules control.

What, then, was the applicable filing deadline here? Defendants filed their notice of removal on November 7, 2025. Under Federal Rule of Civil Procedure Rule 81(c)(2)(C), defendants had seven days to "answer . . . or present other defenses or objections under these rules," establishing a deadline of November 14, 2025. Defendants, however, failed to answer or otherwise assert defenses or objections by that date. Instead, they filed the instant motion on November 18, 2025—four days past the Rule 81(c) deadline. *See* Defs. Mot. Defendants' alternative motion to dismiss is unquestionably untimely. Under the above reasoning, defendants' motion to strike is equally late. Because defendants failed to seek an extension prior to that deadline's expiration, the Court may extend time only upon motion for excusable neglect. *See* Fed. R. Civ. P. 6(b)(1)(B). Defendants have since filed that motion, *see* Defs. Mot to Extend, albeit many months later. The pertinent question is thus whether defendants have demonstrated excusable neglect.

2. *Excusable Neglect and Good Cause*

While this Court does not condone defendants' delay, it finds their neglect excusable under the circumstances. Courts evaluating excusable neglect apply a four-factor equitable test, examining: "(1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on the proceedings; (3) the reason for the delay; and (4) whether the movant acted in good faith." *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010). It is within the Court's discretion to determine whether excusable neglect has been shown under this test. *See Pincay v. Andrews*, 389 F.3d 853, 859 (9th Cir. 2004).

Under this test, and upon considering all relevant circumstances, the Court finds that defendants' neglect was excusable and that good cause exists to extend the filing deadline for the motion to strike. First,

the danger of prejudice to plaintiff is minimal. Defendants' motion was filed only four days late, and as the parties agreed at the hearing, plaintiff had initially asked defendant not to file when planned. *See also* Decl of James Buchal ("Buchal Decl."), ECF 23, ¶ 29. Such minor prejudice "is insufficient to justify denial of relief." *Bateman v. U.S. Postal Serv.*, 231 F.3d 1220, 1225 (9th Cir. 2000). Second, the length of delay was similarly minimal and does not warrant denying the motion. *Cf. id. (*describing a nearly month-long delay as "minimal").

"The reason for the delay is, admittedly, weak." *Id.* It is not, however, so weak as to warrant denying defendants' motion. Defense counsel offers a few reasons for the delay: co-counsel were unable to communicate for several days, counsel was preoccupied with pressing filings in other matters, counsel failed to communicate properly with their law fellow, and counsel believed that they communicated with plaintiff and that plaintiff did not object. *See* Buchal Decl.; Decl. of Abra Siegel, ECF, 24. These excuses—particularly counsel's efforts to shift responsibility or blame to a legal fellow—are not well taken. As counsel of record, the responsibility rests squarely with primary counsel. *See, e.g.*, Or. R. Prof. Conduct 5.1, 5.2, 5.3; N.Y. R. Prof Conduct 5.1, 5.2, 5.3; *see also Laryngeal Mask Co. v. Ambu A/S*, No. 07-cv-1988-DMS NLS, 2009 WL 9530357, at *2 (S.D. Cal. Mar. 20, 2009) (sanctioning counsel who "attempted to blame his own error in not citing the correct authority on a first year associate"); *Burrage-Simon v. State Farm Mut. Auto. Ins. Co.*, No. 2:14-cv-00429-GMN, 2015 WL 5224885 (D. Nev. Sept. 8, 2015) (explaining that counsel's "attempts to blame his associate" were not "compelling," did not comport with the "attorney's obligation," and did not constitute "a valid justification"). Failing to properly supervise and manage a fellow is not justification.

At bottom, defendants failed to follow a simple rule of civil procedure. Disregard of the rules does not generally amount to excusable neglect. *See Speiser, Krause & Madole P.C. v. Ortiz*, 271 F.3d 884, 886-87 (9th Cir. 2001) ("We feel, as did the district judge, that parties who remove cases to the federal courts should become acquainted with and comply with the Federal Rules of Civil Procedure." (quoting *Savarese v. Edrick Transfer & Storage, Inc.*, 513 F.2d 140, 147 (9th Cir. 1975)). However, as this Court's earlier analysis makes clear, the application of this simple rule was in fact relatively complicated here. And

there is no evidence that defendants "acted with anything less than good faith." *Bateman*, 231 F.3d at 1225. Defendants' "errors resulted from negligence and carelessness, not from deviousness or willfulness." *Id.* While defendants' explanation is weak, it is not enough to justify denial of relief under the circumstances. *See Pincay,* 389 F.3d at 858-60 (affirming extension of time where "the mistake itself, the misreading of the Rule, was egregious, and the lawyer undoubtedly should have checked the Rule itself before relying on the paralegal's reading" even though "a lawyer's mistake of law in reading a rule of procedure is not a compelling excuse.").

Altogether, defendants have shown excusable neglect and good cause to extend their responsive pleading deadline. Thus, Defendants' motion for extension of time is granted.

**B. Anti-SLAPP Motion**

Having addressed the procedural and timeliness issues, the Court turns to the merits of defendants' motion. Defendants contend that the gravamen of each of plaintiff's claims is a challenge to protected conduct and that each claim fails as a matter of law. Plaintiff argues that defendants' statements were outright false, wrongfully targeted plaintiff's employment, and caused significant harm. For the reasons set forth below, defendants' motion is granted.

1. *Protected Activity*

All of plaintiff's claims arise out of activities protected under ORS § 31.150(2)(c) and (d). Subsection (c) applies to written statements on issues of public interest that are presented in public spaces. Social media posts—and public internet postings generally may be deemed to have been made in "place[s] open to the public." *See* ORS § 31.150(2)(c); *Neumann v. Liles*, 358 Or. 706, 720, 369 P.3d 1117 (2016); *Lowell v. Wright*, 369 Or. 806, 827, 512 P.3d 403 (2022). Defendants' posts were all made on their public social media page and thus easily satisfy this prong. *See* Reznichenko Decl. Ex. 1.

Defendants' posts also concern issues of public interest. "The touchstone principle in evaluating whether speech is on a matter of public concern is whether the speech must be protected to ensure the continuance of vigorous debate on public issues and, by extension, self-governance." *Lowell*, 369 Or. at 821. Matters of public interest are construed "liberally . . . 'in favor of the exercise of the rights of

expression.'" *DeHart v. Tofte*, 326 Or. App. 720, 744, 533 P.3d 829 (2023) (quoting ORS § 31.152(4)).

Although the parties debate the exact scope of the challenged posts, the outcome is the same under either framing. Defendants argue the posts concern antisemitism, Israel, Palestine, and the war in Gaza—topics plaintiff concedes are issues of clear public interest. *See* Pl. Resp. 6. Plaintiff counters that the posts' messaging is far narrower, cabined strictly to plaintiff's personal views on these issues. *See id.* Plaintiff, however, is an educator, and the public is indeed interested in educators' viewpoints on controversial topics, particularly where the educator has posted those viewpoints online for the world to see. *See Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 967-68 (9th Cir. 2011). *DeHart v. Tofte* lends further support to this conclusion. 326 Or. App. 720, 533 P.3d 829 (2023). In *DeHart*, elected school board members voted on a motion directing the superintended to remove Black Lives Matter and Pride symbols from the school. *Id.* at 722. Parents of students at the school posted information about the school board members in a private Facebook group, including information about the board members' employment and the contact information for their employers. *Id.* at 722-23. The school board members sued under Oregon's anti-doxxing statute and the parents filed an anti-SLAPP motion to strike. Finding for the parents, the Oregon Court of Appeals reasoned that the sharing of the school board members' "employment information furthered lawful forms of civic engagement" on the controversial topics at issue "by members of the public—such as boycott—and informing [their] employers of the reason for the boycott." *Id.* at 744. The court also found that the sharing of employment information could not "meaning-fully be separated, under the first step of the anti-SLAPP statute, from the larger political conversation that was taking place in the . . . Facebook group." *Id.* at 745. Such is the case here as well. Regardless of how narrowly the topics are construed, the topics at issue in defendants' posts concern issues of public interest and are therefore protected under ORS § 31.150(2)(c).

Defendants' posts are also protected under subsection (d). Like subsection (c), subsection (d) requires the speech or conduct to be made "in connection with a public issue or an issue of public interest." ORS § 31.150(2)(d). Subsection (d) additionally requires, as relevant here, that the speech or conduct be made "in furtherance of the exercise of the . . . constitutional right of free speech or freedom of the press."

Having found that defendants' posts concern a matter of public interest, the only question remaining is whether they were made in furtherance of defendants' constitutional rights. Conduct is in furtherance of the exercise of free speech where it is communicative, even if the speech itself is not protected under the First Amendment. *DeHart*, 326 Or. App. at 742. "[S]peech that embarrasses or coerces another into certain action" is not precluded, nor is speech that threatens "social ostracism or vilification to advocate a political position." *Id.* at 743 (cleaned up). Defendants' posts were clearly communicative and, for much of the same reasons described above, can easily be deemed in furtherance of the exercise of free speech. Defendants have therefore satisfied their burden at the first step of the anti-SLAPP analysis. The Court thus turns to the legal sufficiency of plaintiff's claims.

2. *Legal Sufficiency of the Claims*

Because plaintiff's claims arise out of defendants' protected activities, the burden shifts to plaintiff to establish the legal sufficiency of each of her four claims. These claims are discussed in turn below.

a. Defamation Claim

Plaintiff has not demonstrated the sufficiency of her defamation claim because all the challenged statements are protected opinions under the First Amendment.

"To establish a claim for defamation, a plaintiff must show that a defendant made a defamatory statement about the plaintiff and published the statement to a third party." *Neumann v. Liles*, 358 Or. 706, 71, 369 P.3d 117 (2016) (quoting *Wallulis v. Dymowski*, 323 Or. 337, 342-43, 918 P.2d 755 (1996)). Defamatory statements are those which "would subject the plaintiff to hatred, contempt or ridicule or tend to diminish the esteem, respect, goodwill or confidence in which the plaintiff is held or to excite adverse, derogatory, or unpleasant feelings or opinions against the plaintiff." *Id.* (cleaned up). However, statements that are protected under the First Amendment are not defaming. For statements that concern a matter of public interest, the "dispositive question is whether a reasonable factfinder could conclude that the statement implies an assertion of objective fact." *Id.* at 718-19; *see also Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009). Courts employing Oregon law and the Ninth Circuit both

follow a three-part inquiry to make that determination: (1) whether the general tenor of the

> entire publication negates the impression that the defendant was asserting an objective fact; (2) whether the defendant used figurative or hyperbolic language that negates that impression; and (3) whether the statement at issue is susceptible of being proved true or false.

*Chief Aircraft, Inc. v. Grill*, 288 Or. App. 729, 733-34, 407 P.3d 909 (2017) (citing *Neumann*, 358 Or. at 719); *see Gardner*, 563 F.3d at 987. "Words should not be considered in isolation, but, rather, 'the work as a whole, the specific context in which the statements were made, and the statements themselves' must be analyzed" by the Court to determine whether the statements "imply a false assertion of objective fact and therefore fall outside the protection of the First Amendment." *Chief Aircraft*, 288 Or. App. at 734 (quoting *Neumann*, 358 Or. at 719).

Plaintiff challenges four statements here. The first is one of several bullet points listed under the statement "Valley Catholic High School's Sue Lewis is not just instructing in the music school—she's using her platform to spread vile antisemitic hate online." Reznichenko Decl. Ex. 1. The first challenged statement then reads: (1) "calls upon Hamas to destroy Israel." *Id.* The second and third statements are bullet points that follow the statement, "Sue Lewis continues her antisemitic tirades." *Id.*; *see also* Lewis Decl. Ex. 1. These statements read: (2) "denies the Jewish connection to Israel," and (3) "claims jews control humanity, a dangerous trope." *Id.* Fourth and finally, plaintiff challenges a statement that follows the second list of bullet points. That statement reads: (4) "Students at @_ValleyCatholic are in grave danger under Sue Lewis." *Id.* All challenged statements were shared in StopAntisemitism's August 21, 2024 posts, which include links to plaintiff's public Facebook posts. *Id.*

None of these statements, when read in context, imply the assertion of objective fact. First, the general tenor of defendants' posts negates the impression that defendants were asserting objective facts about plaintiff. Viewed contextually, defendants' statements clearly express their interpretation of plaintiff's own posts. The posts begin by stating that plaintiff is "using her platform to spread vile antisemitic hate online," and conclude by stating "Lewis' posts are listed below." *Id.* Photos of plaintiff's posts are shown below defendants challenged statements, as are the archived links to plaintiff's original Facebook posts. Considering the links to plaintiff's posts, the very nature of defendants' "feature," the clear

motivation of the author—who is named StopAntisemitism in the challenged posts—and the opinionated wording used, the general tenor of the posts strongly suggests that the statements reflect only the author's opinions about the words plaintiff chose to share online. *See Obsidian Fin. Grp., LLC v. Cox*, 812 F. Supp. 2d 1220, 1223 (D. Or. 2011), *aff'd*, 740 F.3d 1284 (9th Cir. 2014) ("[S]tatements made as part of an acknowledged heated debate often negate the impression that the defendant was asserting an objective fact." (collecting cases)); *see also id.* at 1223-24 ("[B]logs are a subspecies of online speech which inherently suggest that statements made there are not likely provable assertions of fact." (footnote and citations omitted)).

Viewers are invited to read the posts plaintiff herself shared alongside defendants' characterizations. If defendants were claiming that plaintiff said the exact statements at issue, there would be no reason for defendants to also include plaintiff's actual wording in the posts. Any concern that defendants were misquoting plaintiff is put to rest by reading plaintiff's own statements. This conclusion finds support in *Campos*, where the Oregon Court of Appeals found that the context surrounding a statement that "was posted directly on [the individual] Facebook page in response to [the individual's] own posting about the incident . . . tend[ed] to negate the impression that the statement [was] one of objective fact." 296 Or. App. at 409. The *Campos* court found that the posts, which claimed that the individual in question was "100% guilty," was "a liar," and "a sexual predator," constituted nonactionable opinion. *Id.* at 403, 414-15.

The general tenor of defendants' posts commands the same outcome here. "[D]ivorced from [their] context," the challenged statements "might convey the impression that plaintiff identifies," but "[l]ooking at the entire statement," defendants are sharing their interpretations of plaintiff's words, not stating that plaintiff herself made the exact claims defendants wrote. *Campos*, 295 Or. App. at 409.

Second, defendants used hyperbolic language that negates the impression of fact. Indeed, the entire statements at issue are themselves hyperbolic descriptions of plaintiff's own postings—which again is made clear when viewing the statements in context. The specific wording defendants used is also hyperbolic, describing plaintiff's posts as "antisemitic tirades" and accusing plaintiff of "spread[ing] vile antisemitic

hate online." Reznichenko Decl. Ex. 1. Even the use of the phrase "grave danger" is hyperbolic and clearly based on defendants' views about the words plaintiff shared online. Courts have found similarly extreme claims to constitute rhetorical hyperbole when viewed in context. *See, e.g.*, *Campos*, 296 Or. App. at 411-12 (finding the phrase "we know this man is 100% guilty" was hyperbolic when considering case law that had found use of the word "completely" and "blackmail" to constitute inactionable hyperbole (citations omitted)). The Court thus turns to the final step of the *Neumann* inquiry.

Whether the statements are susceptible to bring proven true or false is a tricker question but ultimately nondispositive. "Although plaintiff may be correct that the question of" what she called upon, denied, and claimed is "something that is susceptible of being proved true or false, the question here is whether the assertions communicated by defendant[s'] statements are ones that are susceptible to being proved true or false." *Id.* at 412. When viewed in context as *Neumann* requires, defendants' statements represent their interpretation of plaintiff's words and thus defendants' personal viewpoints. Because "the expression of a personal viewpoint is not something that is susceptible to being proved true or false," defendants' statements cannot constitute actionable defamation. *Id.*

b. False Light Claim

Plaintiff's false light claim fares similarly to plaintiff's claim for defamation. Invasion of privacy by false light "is like the tort of defamation, in that it leads others to believe something about a person that is not true." *Reesman v. Highfill*, 327 Or. 597, 608, 965 P.2d 1030, 1036 (1998).

The Oregon courts have articulated the elements of the tort of false light as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) the actor has knowledge of or acted in reckless disregard as to the falsity of the publi[ci]zed matter and the false light in which the other would be placed.

*Wickenkamp v. Hostetter Law Grp., LLP*, No. 2:15-cv-296-PK, 2016 WL 10677908, at *17 (D. Or. July 14, 2016) (quoting *Dean v. Guard Pub. Co.*, 73 Or. App. 656, 659 (1985)), report and recommendation

adopted, 2016 WL 10677905 (D. Or. Aug. 17, 2016). As with defamation, courts review false light claims under the *Neumann* standard. *See Campos*, 296 Or. App. at 405-406 (applying *Neumann* jointly to defamation and invasion of privacy claims); *see also Martinez by Martinez v. Democrat-Herald Pub. Co.*, 64 Or. App. 690, 693, 669 P.2d 818, 820 (1983) ("An essential element of plaintiff's claim for invasion of privacy is that the publicity that allegedly placed her in a false light contains some falsity or fiction concerning her that would be objectionable to a reasonable person under the circumstances."). For the same reasons plaintiff's defamation claim fails under *Neumann*, so too does plaintiff's claim for false light invasion of privacy.

c. Tortious Interference Claim

Plaintiff's tortious interference claim fares no better. Tortious interference with economic relations requires the plaintiff to establish six elements:

> (1) the existence of a professional or business relationship (which could include, e.g., a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

*McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995). If liability is based on improper purpose, "then the purpose must be to inflict injury on the plaintiff 'as such.'" *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 498, 982 P.2d 1117 (1999). If liability is based on improper means, "then the means must violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession." *Id.* Interference is thus improper only if it is "wrongful by some measure beyond the fact of the interference itself." *Id.*

Plaintiff argues that defendants intentionally and improperly interfered with her contractual relationship with Valley Catholic "by publishing statements about plaintiff that characterized her as supporting terrorism, denying Jewish history, promoting antisemitic conspiracy theories, and endangering her students." Pl. Resp. 15. Plaintiff's claim thus relies on the same constitutionally protected speech that felled plaintiff's defamation and false light claims. "The same rationale that underlies" the Court's decision

on those claims "—concern for the free speech implications of penalizing political advocacy—applies with equal force with respect to [this] … claim." *Kovac v. Crooked River Ranch Club & Maint. Ass'n*, 186 Or. App. 545, 552, 63 P.3d 1197, 1201 (2003). As described above, defendants' speech cannot "survive challenge" under the federal and state constitutions, and thus cannot supply the improper means or motive needed to support plaintiff's claim. *Id.*

d. Intentional Infliction of Emotional Distress Claim

Plaintiff's final claim for intentional infliction of emotional distress ("IIED") fails for substantially the same reasons. To state an IIED claim, a plaintiff must allege "(1) that defendants intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress; (2) that defendants engaged in outrageous conduct, i.e., conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that defendants' conduct in fact caused plaintiff severe emotional distress." *House v. Hicks*, 218 Or. App. 348, 358, 179 P.3d 730, 736 (2008) (citing *McGanty v. Staudenraus*, 321 Or. 532, 543, 550, 901 P.2d 841 (1995)). "The tort does not provide recovery for the kind of temporary annoyance or injured feelings that can result from friction and rudeness among people in day-to-day life." *Hetfeld v. Bostwick*, 136 Or. App. 305, 308 (1995). To assess the outrageousness of conduct, Oregon courts look to certain "contextual factors" including the existence of a special relationship among the parties, "the illegality of the conduct . . ., whether the conduct was undertaken with an ulterior motive or taken advantage of an unusually vulnerable individual," and whether the conduct occurred in public or in an employment context. *House*, 218 Or. App. at 359-60. The most important factor is whether there exists a special relationship, "such as an employer-employee, physician-patient, counselor-client, landlord-tenant, debtor-creditor or government officer-citizen, that shapes the interpersonal dynamics of the parties." *Id.* at 360.

Defendants' statements here fall on the "injured feelings that can result from friction and rudeness among people in day-to-day life" side of the spectrum. *See Hetfeld*, 136 Or. App. at 308. No special relationship exists between the parties, "plaintiff was not particularly vulnerable to any intentional conduct to cause extreme emotional distress," and plaintiff has not shown that defendants acted "with an ulterior

motive, a motive to advance an illegitimate purpose." *House*, 218 Or. App. at 364-65. While it is true that defamation may sometimes rise to the caliber of outrageous conduct, plaintiff has not shown even defamation here. *Cf. Checkley v. Boyd*, 170 Or. App. 721, 727, 14 P.3d 81 (2000) ("[A] defendant's publication of a defamatory or otherwise significantly stigmatizing statement, knowing the statement to be false, unfounded, or unsubstantiated, is conduct that, if found to be true by a factfinder, constitutes an extraordinary transgression of what is socially tolerable."). Defendants' postings, which contain defendants' constitutionally protected opinions alongside plaintiff's own words, are not extreme and outrageous as a matter of law. Plaintiff's IIED claim must therefore fail as well.

Defendants' motion is therefore granted on all counts and plaintiff's complaint is dismissed. The Court is skeptical that any amendment could cure the identified deficiencies. However, plaintiff did suggest that she may be able to provide more information at the hearing through her request for the case to proceed before the Court entered a factual denial. In light of that request, and in consideration of the procedural complexities outlined above, the Court shall grant plaintiff thirty days to amend her complaint.

## CONCLUSION

Defendants' motion for extension of time to answer complaint, ECF 22, is GRANTED. Defendant's motion to strike or, in the alternative, motion to dismiss, ECF 5, is also GRANTED as to the motion to strike. The complaint is dismissed with leave to amend. Any amended complaint must be filed within thirty (30) days after issuance of this opinion and order.

IT IS SO ORDERED.

DATED this 25 day of September, 2026.

Adrienne E Nelson

Adrienne Nelson
United States District Judge